UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY BIEGLER, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>NATIONAL GENERAL INSURANCE COMPANY, et al.,<br><br>  Defendants. | No. 2:22-cv-00560-MCE-DMC<br><br>**MEMORANDUM AND ORDER** |

By way of this action, Plaintiffs Larry and Alysia Biegler (collectively, "Plaintiffs") seek to recover from Defendants National General Insurance Company and Integon National Insurance Company (collectively, "Defendants") proceeds purportedly due under a homeowners insurance policy that became payable after Plaintiffs sustained losses from a wildfire, known as the "Camp Fire."  Presently before the Court is Defendants' Motion for Summary Judgment.  ECF No. 29.  For the following reasons, that Motion is GRANTED.[1]

///

///

///

---

[1] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Local Rule 230(g).

1

# BACKGROUND[2]

Defendants issued to Plaintiffs a homeowners insurance policy, policy number 2004443487, covering a single-family home owned by Plaintiffs at 5240 Edgewood Lane in Paradise, California.[3]  On approximately November 8, 2018, Plaintiffs lost this home as a result of the Camp Fire.

On June 14, 2019, Plaintiffs purportedly hired Jamyson Co. Public Insurance Adjusting ("Jamyson") to represent them during the balance of the claims handling process with Defendants.  Shawn Bagby of Jamyson held himself out as Plaintiffs' representative, and he provided Defendants with a signed notice of representation between Jamyson and Plaintiffs.  Defendants were instructed to deal with Jamyson going forward.[4]

Defendants accepted coverage for the fire loss and over time paid the Plaintiffs $852,760.83 for Coverage A (Dwelling).  This included coverage for code upgrades, trees, shrubs, plants and debris removal.  Plaintiffs were also paid $75,161.68 for Coverage B (Other Structures), $181,184.00 for Coverage C (Personal Property), $104,624.00 for Coverage D (Loss of Use).

More specifically as to Coverage C (Personal Property), Plaintiffs were paid half of the policy limits of $366,184.00 in the amount of $181,184.00.  Defendants paid that

---

[2] The following facts are taken, primarily verbatim, from the parties' papers.  Unless otherwise indicated, the material facts are undisputed.

[3] Several separate addresses apparently exist on the same parcel of land.  This dispute concerns only the address 5240 Edgewood, not the other addresses on that parcel.

[4] The Court notes that the proffered evidence of this agency agreement is somewhat equivocal.  See Decl. of John Toothman, ECF No. 29-1, ¶¶ 4-5, ECF No. 29-4, Ex. C.  Defendants' documentation indicates that Jamyson represented Plaintiffs as to properties at 5236 and 5238 Edgewood Lane, but there is no reference to 5240 Edgewood Lane.  The contract that refers to 5238 Edgewood Lane, however, does appear to refer to Claim # 3589709, which also appears to correspond to the claim number attached to 5240 Edgewood Lane.  Id., Ex. A.  That agency contract also references the policy at issue in this case.  That said, since there appears to be no dispute that at some point there was an agency agreement between Plaintiffs and Jamyson as to 5240 Edgewood Lane, and because the Court does not reach issues going to the scope of this agreement to resolve the present Motion, it will not try to further resolve these discrepancies on its own.

amount without requiring proof of loss as a good-will gesture extended by homeowner insurance carriers through the recommendation of the Department of Insurance. Bagby did submit to Defendants, however, an 87-page inventory list signed by Larry Biegler and containing over 1500 items with quantities and prices totaling $991,857.79.

During review of that list, it came to Defendant's attention that another personal property estimate from a different unrelated property contained exact duplicates of hundreds of items contained in the Biegler estimate. Because Defendants considered this suspicious, they requested proof of loss for the personal items on Plaintiffs' list prior to paying Plaintiffs any additional monies under Coverage C. Defendants were looking for evidence such as invoices or receipts, photographs, tax returns, or anything else that might establish ownership and possession of the property listed. Plaintiffs did not provide any evidence that any of the property claimed actually existed or was in their possession when the fire occurred.

According to Defendants, Larry Biegler made a statement to them under oath that he personally put together his list of items and personally researched the value of every item on his list. He also stated that every item on the list was purchased with cash and he did not have receipts or proof of ownership for any of the items.

As for Coverage A (Dwelling), Defendants also negotiated that claim with Bagby. Bagby produced an estimate for cost of rebuilding the house, and that estimate exceeded the policy limits. As negotiations continued, Defendants eventually paid out $772,760.00, which included the cost of code upgrades, trees, shrubs, plants and debris removal. Settlement discussions thereafter stalled. During these discussions, however, Larry Biegler and Jamyson confirmed via emails on August 27, 2020, and July 9, 2021, that Jamyson was still representing Plaintiffs. Decl. of Randy Fekrat, ECF No. 29-13, Ex. A.

Bagby continued to engage in discussions with Defendants, and, on March, 3, 2021, he emailed Defendants offering to settle the remainder of the Coverage A (Dwelling) claim for $80,000. There were some further emails back and forth over the

1  next few weeks, with Larry Biegler copied, whereby Defendants and Bagby eventually
2  agreed to that precise settlement.  Toothman Decl., Ex. H.  Defendants thereafter issued
3  an $80,000 check to Plaintiffs and Jamyson, and that check was cashed.  Id., Ex. I.
4      Plaintiffs themselves nonetheless purportedly thereafter emailed Defendants
5  directly to continue to demand the remaining policy limits for Coverage A (Dwelling) and
6  Coverage C (Personal Property).  Defendants denied both requests in a letter from their
7  representative, Randy Fekrat:

> Through the Department of Insurance, you made a request for mediation. You public adjuster representative, Shawn Bagby let us know that one of the lines of coverages you wished to have addressed with mediation was Coverage A - Dwelling. Mr. Bagby advised us that you were requesting $80,000.00 for Coverage A - Dwelling. In Mr. Bagby's email correspondences of March 16, 2021 and March 20, 2021, he confirmed that payment of $80,000.00 for Coverage A - Dwelling will conclude Coverage A - Dwelling resolving all issues pertaining to the rebuild, debris removal, code upgrade, plans, permits, engineering, and all costs associated with the Coverage A - Dwelling portion of your claim. You were copied on these emails of March 16, 2021, and March 20, 2021. Our settlement payment of $80,000.00 for Coverage A - Dwelling was issued on March 26, 2021. Any dispute regarding this settlement is between you and your public adjuster. Unfortunately, we are unable to issue further payment for Coverage A - Dwelling to include code upgrade.
>
> . . . .
>
> Due to your failure to cooperate and provide any meaningful documentation supporting your claimed personal property losses, the balance of the inventory in the amount of $185,000.00 was denied. Unfortunately, we must reaffirm our position denying any further payments towards Coverage C – Personal Property. The decision to partially deny your claim for Coverage C – Personal Property is based on the facts as outlined in the letter dated January 26, 2021, from our attorney.

Decl. of Randy Fekrat, ECF No. 29-16, Ex. C.  Plaintiffs thereafter initiated this action seeking to recover approximately $51,000 for their dwelling and $189,000 for their personal property losses.[5]

---

[5] The precise amounts requested for recovery differ slightly throughout the papers and documentation (e.g., at times in the documentation there references to $189,000 for the dwelling and on other occasions there are references to $185,000), but neither the exact dollar amounts nor any discrepancies are material to the legal issues before the Court.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

6

**ANALYSIS**

By way of the instant action, Plaintiffs seek to recover the full policy limits for Coverage C (Personal Property) and Coverage A (Dwelling). According to Plaintiffs, because Defendants have paid less than those limits, they are liable for bad faith, breach of contract, and breach of the implied covenant of good faith and fair dealing. Defendants, on the other hand, contend that they are entitled to judgment as a matter of law because Plaintiffs themselves failed to perform under the contract and because Plaintiffs cannot show that the failure to pay out the policy limits was a result of Defendants' bad faith. More specifically, Defendants take the position that they were not required to pay out any additional monies under the policy because Plaintiffs declined to provide any documentation supporting the fact that they owned anything on their personal property list and they submitted only minimal documentation in support of their claim for dwelling coverage policy limits. In addition, Defendants contend that Plaintiffs should be bound by the agreement reached with Jamyson, who continued to represent Plaintiffs throughout negotiations, as to the $80,000 payment purportedly made to settle those claims. Defendants' arguments are well taken.

Under California law, insurance contracts, like any other contract, must be construed in accordance with their plain meaning pursuant to ordinary rules of contractual interpretation. St. Paul Mercury Ins. Co. v. Frontier Pac. Ins. Co., 111 Cal. App. 4th 1234, 12435 (2003). Accordingly, an insurance policy "must be interpreted to give effect to the mutual intent of the parties at the time of contracting, and such intent is ascertained, if possible, from the 'clear and explicit' language of the contract." Id.; see also Cal. Civil Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."); Cal. Civil Code § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . ").

"It is axiomatic that a plaintiff who has himself materially breached or failed to

perform a contract may not pursue a breach of contract action against the other party to the agreement." Oracle America, Inc. v. Innovative Tech. Distrib. LLC, 2012 WL 4122813, at *20 (N.D. Cal. 2012) (citations omitted). Indeed, it is "[a] bedrock principle of California contract law . . . that '[h]e who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed.'" Brown v. Dillard's, Inc., 430 F.3d 1004, 1010 (9th Cir. 2005) (quoting Pry Corp. of Am. v. Leach, 177 Cal. App. 2d 632, 639 (1960)).

Although the policy outlines coverages and payments Defendants are expected to honor, it also outlines Plaintiffs' duties as well:

> B. Duties After Loss
>
> In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:
>
> . . . .
>
> 5. Cooperate with us in the investigation of a claim;
>
> 6. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;
>
> 7. As often as we reasonably require:
>
>> a. Show the damaged property;
>>
>> b. Provide us with records and documents we request and permit us to make copies; and
>>
>> c. Submit to examination under oath, while not in the presence of another "insured", and sign the same;

Toothman Decl., Ex. A, at 13.

Given this, the Court has no trouble concluding that Plaintiffs are in material breach of the contract. Despite the foregoing obligations, Plaintiffs have not provided one iota of evidence to show that they owned anything listed on their 87-page personal property list. They have not provided one photograph from either before or after the fire.

They have not provided one receipt. There are no bank statements. There is nothing. Even having suffered through a devastating fire, in this day and age, they should be able to provide something, even if just pictures of the debris. Plaintiffs tacitly concede as much in that they have not even tried to argue here that compliance with their duties is impossible.[6]

Nor have Plaintiffs provided even close to sufficient evidence to justify their dwelling claim. Larry Biegler is acting as his own contractor for the rebuild, and Plaintiffs have access to all invoices and records of costs.[7] Despite that, Plaintiffs have provided the Court only a handful of invoices pertaining to any work conducted on the underlying property. Furthermore, what they have proffered includes multiple duplicative invoices and bills for other property addresses as well. See Decl. of Larry Biegler, ECF No. 34-2, Ex. E. This is wholly insufficient to meet Plaintiffs' burden to show on summary judgment that there is a triable issue of fact as to whether Defendants have wrongfully refused to pay out under the policy.

In fact, in opposition, Plaintiffs primarily argue that given a large recovery they received under a Fire Victim Trust ("FVT"), it should be inferred that their claims in this case exceed their policy limits as well. In addition, Plaintiffs offer a declaration and cost of rebuild estimate from a contractor, Michael Nedobity, to show that their rebuild costs will be so high that a policy-limit payout must undoubtedly be warranted. Finally, Plaintiffs contend that Defendants' own expert evaluated Plaintiffs' 87-page property list and reached a valuation that, though less than Plaintiffs', still exceeded the policy limits, which leads to the conclusion that a policy limit payout is required. Each of these arguments fail.

---

[6] Plaintiffs do argue that "[they] provided Defendants with all documents in their possession and requested of them" and that they provided Defendants with a file sent to a "Fire Victim Trust," as discussed below. Pls. Opp'n, ECF No. 33, at 9. The problem with this argument is that Plaintiffs have not provided any evidence to the Court demonstrating the same.

[7] Unlike with the personal property that was destroyed in the fire, there is no question that proof of the repair costs should be readily available to Plaintiffs.

First, it makes no difference how Defendants' expert valued the property listed by Plaintiffs because valuation is not the issue. The issue here is that there is no proof that any of that itemized property existed or was at the residence during the fire. Without evidence that Plaintiffs owned the property, any valuation is beside the point.

Second, a cost of rebuild estimate has no bearing on the evaluation of the actual costs incurred. Plaintiffs' witness, Mr. Nedobity, declares that the cost to rebuild Plaintiffs' home would be $2,417,791.60. See Decl. of Michael Nedobity, ECF No. 33-4, at ¶ 2, Ex. A. However, there is no need to resort to an estimation of repair cost, when there are actual costs being incurred. Ultimately, testimony or evidence regarding this estimate simply has no bearing on this case.[8]

Plaintiff's argument as to the FVT is equally irrelevant. Plaintiffs were awarded several million dollars ($3,146,347.18) from the FVT, which is funded by PG&E, the entity responsible for the Camp Fire. Plaintiffs contend that because this award is so large, and would have been larger except that it was reduced by factoring in insurance offsets, it is clear that Plaintiffs' losses as set forth under the policy must also exceed the policy limits. Plaintiffs' argument is unpersuasive because they have not established how this FVT, which, to emphasize, is a settlement from the tortfeasor responsible for the destruction in the first place, has any relevance to Plaintiffs' contractual claims with Defendants. Plaintiffs have not established that the valuations conducted in reaching the settlement figures under the FVT bear any similarity to the valuations Defendants would undertake here. To the contrary, that settlement appears to cover three separate addresses existing on Plaintiffs' real property and is not limited to payment for losses incurred only at 5240 Edgewood Lane. Moreover, there is no evidence in the record to establish what form of valuation the trust administrators employed in reaching their final

---

[8] The Court notes that it is troubled by the cost of repair estimate in any event. For example, Mr. Nedobity appears to estimate the cost for rebuilding the dwelling itself at $1,557,122.17, but there is no breakdown included in the estimate itself to show how that number was reached. Moreover, to the extent Plaintiffs intend to offer Mr. Nedobity's valuation as an expert opinion, they have not established that he is appropriately qualified. Accordingly, even if the Court were inclined to rely on an estimate, this one would still not be helpful.

settlement figures.  Finally, there is no indication as to what kind of evidence Plaintiffs were required to submit to the FVT.  Reliance on the FVT settlement thus misses the mark.[9]

Given that the undisputed evidence before the Court shows that Plaintiffs provided no documentation to support their 87-page personal property valuation and provided very little in the way of documentation as to the cost of their dwelling rebuild, the Court concludes that Defendants were not obligated to pay anything additional to Plaintiffs under the policy.  Moreover, because the Court finds that Plaintiffs' themselves materially breached the policy provisions and that Defendants were not required to pay additional monies under the contract, it follows that there was also certainly no bad faith or breach of the implied covenant of good faith and fair dealing.  See Avila v. Countrywide Home Loans, Case No. 10-cv-05485-LHK, 2010 WL 5071714, at *5 (N.D. Cal. Dec. 7, 2010) ("Under California law, a claim for breach of the covenant of good faith and fair dealing requires that a contract exists between the parties, that the plaintiff performed his contractual duties or was excused from nonperformance, that the defendant deprived the plaintiff of a benefit conferred by the contract in violation of the parties' expectations at the time of contracting, and that the plaintiff's damages resulted from the defendant's actions."); Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001) ("In order to establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause.").  Defendants' Motion is thus GRANTED in its entirety.[10]

---

[9] Inversely, the Court would likewise not consider the FVT settlement in evaluating whether Plaintiffs have been adequately compensated for their losses overall, such that Defendants should be excused from paying what is due under the policy.  Defendants are required to pay out under the terms of the policy regardless of any settlements Plaintiffs may have received from other sources.  The fact that Plaintiffs were awarded millions of dollars in a separate proceeding does not mean their coverage should be limited in any way under the policy, just as the fact that they were awarded coverage from the FVT does not mean that they should automatically receive a full policy payout here.

[10] Because Plaintiffs failed to comply with the terms of the Policy requiring that they provide documentation in support of their claims, there is no need for this Court to reach the question of whether the $80,000 settlement as to the dwelling coverage was binding on Plaintiffs.

**CONCLUSION**

Defendants' Motion for Summary Judgment (ECF No. 29) is GRANTED. The Clerk of the Court is directed to enter judgment for Defendants and to close this case.

IT IS SO ORDERED.

Dated: December 13, 2023

MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE

12